## Staunton

NORFOLK-PORTSMOUTH NEWSPAPERS, INCORPORATED v. MARY H. STOTT.

September 8, 1967.

Record No. 6468.

Present, All the Justices.

*Shepard W. McKenney* (*Kaufman, Oberndorfer and Spainhour,* on brief), for plaintiff in error.

*William C. Worthington* (*Thomas L. Woodward,* on brief), for defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The question for decision in this case is whether Mary H. Stott, plaintiff, was entitled to benefit from a series of labor contracts executed between Norfolk-Portsmouth Newspapers, Incorporated, defendant, and the Hampton Roads Newspaper Guild during her term of employment by defendant.

Plaintiff, in a motion for judgment filed December 10, 1958, alleged that she was employed September 1, 1949, by defendant as a news reporter for the Suffolk area at defendant's Suffolk office "for newspapers owned, published and controlled by defendant, namely, The Virginian-Pilot and Norfolk Landmark, and the Norfolk Ledger-Dispatch, which employment continued until May 1st, 1957";

that she was covered by the contract made between defendant and the Guild,[1] which contract was unknown to her and concealed from her by defendant, and that she was entitled to wages at a rate higher than was actually paid her.

Defendant's response admitted plaintiff's employment, but denied that she was employed as a news reporter, and denied the other allegations of the motion for judgment.

The evidence was heard by the trial court, sitting without a jury, and on March 28, 1966, the court entered judgment for plaintiff in the sum of $4,987.50, with legal interest on various portions of this amount from various dates during her term of employment. To this judgment the defendant was granted a writ of error.

Defendant and its corporate predecessor, Norfolk Newspapers, Incorporated, published the Virginian-Pilot and Norfolk Landmark (later the Virginian-Pilot) and the Norfolk Ledger-Dispatch (later the Ledger-Star).

On December 10, 1953, an agreement was executed between defendant's predecessor, as publisher, and the Hampton Roads Newspaper Guild, Local 219, American Newspaper Guild, C.I.O., the Guild contracting "for itself and on behalf of all of the employees of the Publisher in the Editorial Department of the Norfolk Virginian-Pilot," with exceptions not here material. The opening paragraph of the contract also provided: "The word 'employee' or any reference to them, whenever used in this agreement, shall be construed to include only employees of the Publisher covered by the contract."

Article II provided:

"1. Job classifications and experience rating of employees on the payroll as of the signing of this agreement have been agreed upon by the Publisher and the Guild.

"2. * * [This section provided for classifying and rating employees hired after the effective date of the agreement, and stipulated that if the publisher and the Guild could not agree within thirty days of the hiring, the matter should be submitted to arbitration as provided in the contract.]

" * *

"5. Effective as of 30 days prior to this agreement, the weekly

---

[1]Actually, three separate agreements were executed between defendant and the Guild during the period of plaintiff's employment. Since, so far as is material in this case, the three contracts were substantially the same, reference will usually be to "the contract," meaning the first contract, dated December 10, 1953, and also the contracts made in 1955 and 1957, unless otherwise indicated.

salaries of employees engaged directly in the preparation of news and editorial matter, features, art or photographs shall be not less than the following * *."

Detailed minimum wage scales for several categories of employees, including general reporters, limited assignment reporters, women's page reporters and society page reporters were then set forth.

Attached to the agreement was a list of names, classifications, ratings, base salaries and anniversary dates, entitled: "AGREED SCHEDULE OF JOB CLASSIFICATIONS AND EXPERIENCE RATINGS OF EMPLOYEES ON PAYROLL AS OF THE SIGNING OF AGREEMENT, DECEMBER 10, 1953." The schedule contained the names of and the data concerning sixty-two employees. Plaintiff's name was not included.

Two other contracts, dated March 24, 1955, and February 21, 1957, were also introduced as exhibits. The 1955 exhibit contract did not have a schedule attached, but it was clearly indicated that one was attached. Article II, section 3 thereof, for example, specifically refers to "the attached initial classification list." The 1957 agreement contained a schedule listing seventy-two names of employees then on the payroll and gave their classifications and ratings. Again plaintiff's name was not included.

Plaintiff does not claim that she was listed as an employee of the defendant in any of these three contracts of 1953, 1955, 1957, although she was regularly employed by the defendant from September, 1949, until May, 1957, the period in which all of them were executed.

Plaintiff's claim is that she was a third-party beneficiary of these contracts and entitled to be paid on the same basis as those who were named in the schedules, rather than on the basis of her own separate contract with the defendant. She seeks to bring herself within § 55-22 of the Code,[2] which provides that if a covenant or promise is made for the benefit of a person "with whom it is not made," i.e., who is not specifically a party to it, such person may maintain an action on it as if it had been made with him only.

---

[2] "§ 55-22. When person not a party, etc., may take or sue under instrument.— * * if a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise. * *"

In *Graybar Electric Company* v. *Doley*, 4 Cir., 273 F.2d 284, this statute was relied on as giving Graybar a right of action against defendants, stockholders of Eastern Broadcasting Corporation, who had executed a written agreement to advance money to Eastern for necessary financing. In denying Graybar's claim the court said:

> "It is clear from the wording of the statute that it limits the right of a third person to sue upon a contract to which he is not a party to a case where it can be shown that the contract was made for his benefit. We think Graybar does not meet this test. It will be noted that a third person may now sue on a contract to which he is not a party though he is not named therein and he is not solely benefited thereby; but only if the contract was made for his benefit. * *" 273 F.2d at 289.

Consonant with this holding is the statement in *Burton* v. *Chesapeake Box, etc., Corp.*, 190 Va. 755, 767, 57 S.E.2d 904, 909, that this section "has no application unless the party sought to be held liable has assumed an obligation for the benefit of a third party. The statute does not purport to create a contract when no contract exists."

In 17A C.J.S., Contracts, § 519(4) (c), pp. 966-7, it is said:

> "A clear intent to benefit the third person must appear to enable him to sue on the contract; incidental beneficiaries cannot maintain an action thereon.
> "* *
> "Fact that the parties to a contract must have clearly and definitely intended it to be for the benefit of the third person to enable him to sue thereon is one of the most commonly expressed limitations on the rule. * *"

See 17 Am. Jur.2d, Contracts, § 304, p. 727; 4 M.J., Contracts, § 81, 1966 Cum. Supp., p. 89.

The contract here relied on does not indicate an intent to benefit the plaintiff. An intent to the contrary is rather clearly demonstrated.

The statute does not interfere with the freedom of contract. It does not require the inclusion of persons not intended to be included. *Montague Mfg. Co.* v. *Homes Corp.*, 142 Va. 301, 309, 128 S.E. 447, 449.

The immediate contracting parties to the agreement here involved were at pains to set out those intended to be benefited. The contract, as stated, was on behalf of all of the employees of the publisher "in the Editorial Department of the Norfolk Virginian-Pilot," with the exception of the editor and others specified; but "employee" included only "employees of the Publisher covered by the contract"; and it was expressly stated (Article II) that the classifications and ratings of the employees on the payroll at the signing of the agreement "have been agreed on" by the contracting parties. Plaintiff was then an employee on the payroll but was not among those listed as agreed on according to the attached schedules.

Article II also provided for the classification and experience ratings of new employees and the 1957 contract listed the names, classifications and ratings of those then on the payroll, seventy-two in all. Plaintiff was still then on the payroll but her name was not among those listed as having been agreed on.

That the omission of the plaintiff's name from the list of those covered by the contract was not accidental is further attested by this statement in Article XIII, section 2, of the contract:

"The parties to this contract agree that they have bargained fully with respect to wages, hours and all other bargaining terms and conditions of employment, and have settled same for the duration of this agreement in accordance with the terms hereof, * *."

If it be considered that the meaning of the contract is not clear and that oral testimony is admissible to show that the plaintiff was intended to be covered by it along with those named as its beneficiaries, the testimony introduced did not accomplish that result. It was in relevant part as follows:

Plaintiff testified that after being employed by the Norfolk Newspapers in 1947 and 1948 as a substitute for absent personnel, she was later rehired by Mr. Burkett (then defendant's circulation manager) in September, 1949. She stated: "When I started work in 1949 I worked as Mr. Burkett hired me to, to work in the News Department and then to assist Mr. Daugherty if he got in a jam, to do what classified ads that came in, and handle all the news that came over the phone when Mr. Charles wasn't there, and to assist Mr. Charles in his News Department." (Mr. Charles was Suffolk reporter for the Virginian-Pilot.) She was asked whether she performed any serv-

ice for the Ledger-Dispatch and she replied that she did and that "Mr. Burkett demanded that I give every piece of my copy that I wrote for the Pilot for the Ledger-Dispatch." She did this for about a month, she said, and then Mr. Batten [identified in the 1955 contract as "Publisher"] told her that she did not have to give her copy "to any newspaper."

Plaintiff answered all the telephones, she said, for the whole office because she was there all the time. "If somebody brought news I came in the news [sic]; if ad, I put on Mr. Daugherty's desk; if they had a complaint I put it on the desk it belonged to." She was a reporter, she said, and "did hard news and the women's clubs."

Preston Charles, plaintiff's only additional witness, testified that plaintiff "handled most of the church news and women's meetings and obituaries, that sort of thing generally"; and that he considered that reporting. He estimated that the plaintiff spent two-thirds or three-fourths of her time on taking news stories on the phone and working on the news, usually brief items about meetings and parties. Her work, he said, was confined to the office where she was supposed to be eight hours a day; her line of work was not of the same type as his and she had said that she was not really a general news reporter and was not in that classification. She had duties other than news, he said, principally to answer the telephone, serve as a receptionist, and do clerical work in helping Daugherty in his advertising.

Charles did not remember whether he discussed the Guild contract with the plaintiff until toward the last of her employment, but believed he discussed it with Anderson, president of the Guild, who "took the position that she was supposed to have been covered by the contract." Charles said it was generally known in the office that reporters were covered by the contract. Plaintiff herself testified that she overheard the conversation between Charles and Burkett "that they were forming a guild." She referred in her testimony to the fact that "after they signed the union guild they were not allowed to work but so many hours." She knew about the contract, she said, but did not know that she came under it until she saw it when she was leaving.

For the defendant, O. L. Burkett, circulation manager of the defendant, now retired, testified that to fill a need in the Suffolk office, he employed the plaintiff as a receptionist and clerk in that office. Her duties were to assist persons who came in, to answer telephones and type paper material that had to go to the Norfolk office from

the circulation and advertising men, and in answering the telephone if there was a news item that she could take down, she usually did that and passed it on to her news reporter. He and the plaintiff both were employed by both newspapers, the Virginian-Pilot and the Ledger-Dispatch, and he was her sole supervisor and was in the Suffolk office practically every day. It was not his business, he said, to hire reporters and he would not have done so. Some six to eight months before plaintiff left her employment, she asked him if she was classified as a reporter and he told her she was not.

Norman Daugherty was employed by Norfolk Newspapers since prior to 1949 in the Suffolk office, first as advertising manager and recently as executive manager. The duties of the plaintiff, he said, were to answer the telephone, to help in the circulation department, in the classified ads, in the news department, and she helped in every department in the office. So far as news was concerned, he said, she handled "what they call canned news, church bulletins, church news, and so far as definite assignments I don't know of any."

David Baines, employed in the Suffolk office since 1951, testified that he spent most of his time in the office and that plaintiff's job was general office work, answering telephones, counter service, in circulation and advertising, and some news; that she was not considered a news reporter, to his knowledge, and was not employed by the Pilot, "just generally Norfolk Newspapers."

Cameron Gregory, defendant's personnel director, testified that the editorial department of the Virginian-Pilot is concerned with the preparation and production of the news content of the paper; that a reporter is considered to be a person who gathers, prepares and organizes material that is used in a news story. His function is to contact news sources and obtain news and material that can be included in the news content of the newspapers. There are no reporters, he said, in the editorial department of the Virginian-Pilot who work for both newspapers.

The schedule of classifications and ratings attached to the contract was intended, he testified, to cover every employee in the editorial department and one of its purposes was to eliminate any disagreement as to who was covered by the contract.

The evidence strengthens what appears to be the clear implication from the contract itself that it was not the intention of the contracting parties to make the plaintiff a beneficiary of the contract; and the record shows that in fact the contract was not made, in whole

or in part, for her benefit. She is therefore not entitled to recover from the defendant in this action and the judgment appealed from is accordingly reversed and final judgment entered here for the defendant.

*Reversed and final judgment.*